# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

**TISHIEKA ANNGENETTA BARNES,**

     **Plaintiff,**

**v.**                                                    **Case No: 5:16-cv-472-Oc-18PRL**

**COMMISSIONER OF SOCIAL
SECURITY**

     **Defendant.**

_____

## REPORT AND RECOMMENDATION[1]

Plaintiff appeals the administrative decision denying her applications for Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Upon a review of the

record, the memoranda, and the applicable law, I recommend that the Commissioner's decision be

**affirmed.**

### I. BACKGROUND

Plaintiff filed applications for SSI and DIB benefits, alleging disability beginning June 1,

2005. (Tr. 142–48, 156). The claims were denied initially and upon reconsideration. (Tr. 85–97).

At Plaintiff's request, a hearing was held before an administrative law judge who, in March 2009,

found that Plaintiff was not disabled. (Tr. 5–73). After the Appeals Council denied her request for

---

[1] Specific written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local Rules, M.D. Fla., within fourteen (14) days after service of this report and recommendation. Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal. Within 14 days after being served with a copy of the recommended disposition, a party may file written objections to the Report and Recommendation's factual findings and legal conclusions. See Fed. R. Civ. P. 72(b)(3); Fed. R. Crim. P. 59(b)(2); 28 U.S.C. § 636(b)(1)(B); Local Rule 6.02. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. See 11th Cir. R. 3-1.

review, Plaintiff appealed to this Court. (Tr. 1–3). The Court remanded the case in March 2011. (Tr. 589–626).

After another hearing, another administrative law judge found that Plaintiff is not disabled the next November. (Tr. 475–512, 640–73). The Appeals Council remanded in 2013. (Tr. 674–79). This process repeated—another hearing, another written decision, another remand from the Appeals Council. (Tr. 437–74, 680–728).

A hearing was then held before Administrative Law Judge Robert D. Marcinkowsk (ALJ), who found that Plaintiff is not disabled on January 12, 2016. (Tr. 347–436). That decision is at issue here.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (Tr. 353). At step two, the ALJ determined that Plaintiff had the following severe impairments: a cervical spine disorder; obesity; carpal tunnel syndrome; an affective disorder; and, an anxiety disorder. (Tr. 353–55).

At step three, the ALJ found that Plaintiff did not have an impairment or a combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 355–58). Next, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work as defined in 20 CFR §§ 404.1567(a) and 416.967(a) except,

> the claimant can: occasionally climb (ramps/stairs), balance, stoop, kneel, crouch, and crawl; never climb (ladders, ropes/scaffolds); occasionally use left upper extremity for overhead reaching; and, frequently (not constant/repetitive use) bilateral upper extremities for handling, fingering and gross manipulations. The claimant must avoid: concentrated exposure to vibration, fumes/odors/dust; hazards/machinery/heights; and can understand, remember, and carry out simple instructions; perform simple routine tasks; and, have occasional interaction with supervisors/coworkers/public.

(Tr. 358–87). At step four, the ALJ determined that Plaintiff was unable to perform her past relevant work. (Tr. 387).

At step five the ALJ found that considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the Plaintiff can perform—the sedentary and unskilled occupations of document preparer, jewelry prepare, lens block stager. (Tr. 387–88).

Thus the ALJ found that Plaintiff was not disabled from June 1, 2005 through the date of the decision. (Tr. 388). The Appeals Council then denied Plaintiff's request for review. (Tr.340–46). With her administrative remedies exhausted, Plaintiff filed the instant appeal. (Doc. 1).

## II. STANDARD OF REVIEW

A claimant is entitled to disability benefits when he or she is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve months. 42 U.S.C. §§416(i)(1), 423(d)(1)(A); 20 C.F.R. §404.1505(a).

The Commissioner has established a five-step sequential analysis for evaluating a claim of disability, which is by now well-known and otherwise set forth in the ALJ's decision. *See* 20 CFR §§ 404.1520(a), 416.920(a); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). The claimant, of course, bears the burden of persuasion through step four and, at step five, the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987).

The scope of this Court's review is limited to a determination of whether the ALJ applied the correct legal standards and whether the findings are supported by substantial evidence. *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988)(citing *Richardson v. Perales*, 402 U.S. 389, 390 (1971)). Indeed, the Commissioner's findings of fact are conclusive if supported by

substantial evidence. 42 U.S.C. §405(g). Substantial evidence is more than a scintilla – i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (*citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *accord Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991). Where the Commissioner's decision is supported by substantial evidence, the District Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). This is clearly a deferential standard.

## III.    DISCUSSION

Plaintiff raises numerous arguments on appeal, which can be categorized into two general groups: (1) the ALJ erred in considering the opinion evidence and (2) the ALJ erred in evaluating several of Plaintiff's impairments. For the reasons discussed below, I submit that the ALJ's decision should be affirmed.

### A.    The ALJ properly considered the opinion evidence

The ALJ must state with particularity the weight given to different medical opinions, including non-examining state agency physicians, and the reasons therefor. *Winschel v Comm'r of Social Sec*., 631 F.3d 1176, 1179 (11th Cir. 2011). The opinions of treating physicians are entitled to substantial or considerable weight unless "good cause" is shown to the contrary. *Crawford v. Comm'r of Soc. Sec.*, 363 F. 3d 1155, 1159 (11th Cir. 2004). Good cause exists "when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own

medical records." *Phillips* v. *Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004). With good cause, an ALJ may disregard a treating physician's opinion, but he "must clearly articulate [the] reasons" for doing so. *Id*. at 1240–41.

In contrast, the opinion of a non-treating physician is not entitled to controlling weight, but instead "depends, among other things, on the extent to which it is supported by clinical findings and is consistent with other evidence." *Jarrett v. Comm'r of Soc. Sec.*, 422 F. App'x 869, 873 (11th Cir. 2011) (citing 20 C.F.R. § 404.1527(c)(3)). Indeed, "the more consistent a physician's opinion is with the record as a whole, the more weight an ALJ should place on that opinion." *Id.* Finally, certain medical sources are not "acceptable medical sources" for establishing an impairment, 20 C.F.R. § 404.1502(a), but are considered "other medical sources" whose testimony may be used to show the severity of an impairment and how it affects ability to work. 20 C.F.R. § 404.1527(f)(1).

*1.      The opinion of Plaintiff's treating neurologist, Lance Kim, D.O.*

On December 10, 2013, Dr. Kim completed a two-page "*Functional Capacity Evaluation*" form, which consisted of mostly checked boxes. (Tr. 1613–14). *See, e.g.*, *Burgin v. Comm'r of Soc. Sec.*, 420 F. App'x 901, 903 (11th Cir. 2011) (noting that "the A[ppeals] C[ouncil] was free to give little weight to the conclusory assertions contained in the questionnaires because they merely consisted of items checked on a survey, with no supporting explanations.").

On that form, the doctor opined that Plaintiff can only lift five pounds occasionally and one pound frequently; she can only sit for five hours and stand or walk two hours in an eight-hour workday; she can only sit for one hour before needing to move around and can only stand or walk for thirty minutes before needing to sit; she must alternate sitting and standing every thirty minutes; she needs a cane to ambulate during a workday; she should avoid heat and noise. (Tr. 1613).

Further, she can only push or pull rarely; can never climb stairs or ladders and can never balance; can only occasionally use gross manipulation; can rarely use find manipulation; can rarely bend or stoop; can occasionally reach overhead; can occasionally drive; and can never work around hazardous machinery. (Tr. 1613).

According to Dr. Kim, Plaintiff will miss more than four days of work a month. (Tr. 1614). Her symptoms are severe enough to constantly interfere with the attention and concentration needed to perform simple work tasks. (Tr. 1614). These restrictions applied as of November 16, 2011. (Tr. 1614). Lastly, Dr. Kim stated that these limitations are due to Plaintiff's lumbar spinal stenosis, rotator cuff tear, fibromyalgia, and sleep apnea; the doctor did not specify what specific limitations were associated with each of these impairments. (Tr. 1614).

On that same day, Dr. Kim apparently examined Plaintiff and completed an examination note. (Tr. 1615–16). In that note, the doctor stated that "[g]iven the resistant nature of [Plaintiff's] generalized body pain syndrome, which has been terribly disabling, which has not responded to an extensive trial of a variety of analgesic and physiotherapy, I feel that she is medically disabled." (Tr. 1616).

The ALJ, in considering Dr. Kim's opinion, accorded it little weight. According to the ALJ, "[a]lthough Dr. Kim had a long treating relationship with the claimant, his report contains inconsistencies" and "[t]he doctor's opinion is without substantial support from the other evidence of record, which obviously renders it less persuasive." (Tr. 385). For example, the ALJ noted that "[a]n MRI of the lumbar spine showed mild spinal stenosis at the L4-L5 and L5-Sl levels" and that "Dr. Kim's progress notes did not mention the claimant require a cane to ambulate." (Tr. 385). The ALJ further noted that Dr. Kim did not mention any of the above-stated limitations in his progress notes.

As to Plaintiff's fibromyalgia, the ALJ stated that "[t]here is no mention of fibromyalgia in Dr. Kim's progress notes." (Tr. 385). As to the shoulder injury, the ALJ found that impairment did not last twelve months.[2] (Tr. 353, 383). Lastly, the ALJ noted that to the extent Dr. Kim found that Plaintiff is disabled, this finding is an issue reserved for the Commissioner. (Tr. 385–86). I submit that these reasons constitute good cause for discounting Dr. Kim's opinion.

I begin with Plaintiff's back impairment. As to any limitations Dr. Kim found that are due to Plaintiff's lumbar spinal stenosis, the ALJ explicitly noted that such limitations are inconsistent with Plaintiff's MRI, which showed only "mild spinal stenosis at the L4-L5 and L5-Sl levels." (Tr. 385, 1553).

Although Plaintiff complains here that the ALJ erred by omitting that a September 2009 MRI (Tr. 1512–13) also showed a focal flattening of the thecal sac and mild canal stenosis, see Pl.'s Br. at 13, this complaint is meritless for two reasons. First, the ALJ explicitly noted a November 2009 MRI showing "focal flattening of the thecal sac, and there was mild canal stenosis." (Tr. 368). Second, the ALJ's characterization that a MRI showed only "mild stenosis at the L4–L5 and L5–S1 levels" is actually a direct quote from Dr. Kim's own treatment notes. (Tr. 1553) ("Chronic low-back pain: MRI of the lumbar spine in the past showed mild spinal stenosis at the L4-L5 and L5-Sl levels."). Additionally, the ALJ noted that a March 2011 comparison MRI showed that Plaintiff "was essentially stable as compared to the previous MRI." (Tr. 375, 382, 1506). Lastly, the ALJ noted that Dr. Kim himself stated in 2009 that Plaintiff's chronic leg weakness and the MRI findings, were not "significant enough to consider surgical intervention." (Tr. 369, 1425).

---

[2] As Plaintiff addresses her shoulder impairment in detail in a later portion of her brief, I will do the same here.

And to the extent that the ALJ found that the other evidence is inconsistent with the limitations Dr. Kim says are caused by Plaintiff's back impairments, substantial evidence supports this finding. For example, the ALJ noted that Plaintiff's motor strength was 5/5 and her gait was stable in March 2009 (Tr. 320, 366–67) and in October 2012 her muscle power was 5/5 and was found to only have trouble lifting heavy objects (Tr. 374, 1196–97). The ALJ noted that Plaintiff either testified or reported that she, in albeit limited ways, cooks and grocery shops, bathes and dresses, attends to personal needs, does laundry and household chores. (Tr. 384, 415, 991, 993, 994). The ALJ also gave great weight to the opinion of examining physician Lilian Akagbosu, M.D.M.P.H., who found that Plaintiff has trouble lifting *only* heavy objects. (Tr. 385, 1197).

Second, Dr. Kim also attributed Plaintiff's limitations to her sleep apnea. The ALJ found, however, that "a CPAP Titration Polysomnography Report revealed sleep disruptive obstructive apnea and hypopnea, resolved with CPAP." (Tr. 364, 243–44). Plaintiff makes no mention of her sleep apnea in her brief before the Court.

Third, as to Plaintiff's fibromyalgia, the ALJ explicitly found that Dr. Kim's progress notes failed to mention that Plaintiff suffers from fibromyalgia. (Tr. 385). And this is a true reflection of the record prior to the completion of the form at issue. Indeed, the Court cannot find any mention of fibromyalgia prior to December 2013 and Plaintiff presents none here. Thus the ALJ did not err in this regard.

But in several progress notes that span from April 2014 to June 2015 the doctor stated that Plaintiff had "[d]iffuse generalized body pain syndrome of mixed etiologies including fibromyalgia." (Tr. 1680, 1683, 1686, 1689). Notably, the ALJ did address the June 2015 diagnosis: "She had diffused generalized body pain syndrome of mixed etiologies including fibromyalgia and rotator cuff tendonitis." (Tr. 380). Also, the progress notes form April 2014 to

June 2015 contain no further explanations of what limitations, if any, that fibromyalgia causes Plaintiff. In any event, assuming that the ALJ did err by discounting Plaintiff's fibromyalgia diagnosis given the absence of such in Dr. Kim's progress notes, the Commissioner considers any error associated with the ALJ's mischaracterization of the record harmless. (Df.'s Br. at 9–10).

To explain, the Commissioner states that "[n]either Dr. Kim nor any other doctor otherwise discussed [fibromyalgia], and Dr. Kim's records gave no basis for the diagnosis and identified no list of symptoms related to it" and "there is nothing in the record related to fibromyalgia beyond a possible diagnosis, and diagnoses do not establish work-related limitations." (Df.'s Br. at 9); *see Wind v. Barnhart*, 133 F. App'x 684, 690 (11th Cir. 2005) (stating that "a diagnosis or a mere showing of' 'a deviation from purely medical standards of bodily perfection or normality' is insufficient; instead, the claimant must show the effect of the impairment on her ability to work") (quoting *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986)); *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003) ("[T]he claimant bears the burden of proving that he [or she] is disabled, and, consequently, [the claimant] is responsible for producing evidence in support of his [or her] claim."). I agree.

Plaintiff has failed to point to any part of the record in which Dr. Kim states what limitations her fibromyalgia may cause (and the form at issue, of course, does not specify which limitations Plaintiff's purported fibromyalgia causes). To be sure, fibromyalgia often lacks medical or laboratory signs and, thus, "is generally diagnosed mostly on a[n] individual's described symptoms." *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). "F[ibromyalgia] is a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." SSR 12-2P at *2 (S.S.A.

July 25, 2012). But here, Plaintiff has failed to point to any subjective symptoms in her brief that the ALJ overlooked or that would otherwise support her diagnosis.

To this point, the ALJ thoroughly addressed and summarized numerous progress notes from Dr. Kim about Plaintiff's chronic leg weakness, diabetic neuropathy, diabetes mellitus, carpal tunnel syndrome, spinal stenosis, morbid obesity, obstructive sleep apnea, hypertension, restless leg syndrome, generalized body pain, and iron deficiency (Tr. 364, 367, 368–89, 375, 376–77, 378, 380)—along with Plaintiff's complaints of pain and fatigue that span from 2006 to 2015 (Tr. 1406, 1410, 1411, 1413, 1552, 1554, 1555, 1557, 1558, 1560, 1615, 1679–80, 1682–83, 1685–86, 1688). And despite this consistent treatment of numerous impairments and despite these consistent complaints, Plaintiff makes no attempt here to explain what symptoms she complained of that were caused by fibromyalgia, nor does she point to record evidence that the ALJ ignored or explain what evidence, beyond the mere diagnosis of fibromyalgia, that would support such an impairment.

Fourth, as to any use of a cane and the limitations that Dr. Kim imposed on Plaintiff's ambulation, several portions of the record cited to by the ALJ show that Plaintiff had a normal gait. (Tr. 241, 266, 320, 1196, 1200, 1269, 1412, 1427, 1628, 1647, 1658). And these records span from 2006 to 2014 and, as the ALJ notes, are from Dr. Kim himself. (Tr. 385). Thus substantial evidence supports the finding that Dr. Kim's opinion that Plaintiff cannot work without a cane is inconsistent with the other medical evidence.

In sum, the ALJ properly considered Dr. Kim's opinion.

2.    *The medical opinions related to Plaintiff's mental impairments*

Plaintiff's asserts that the ALJ made several errors in considering the opinion evidence related to her mental impairments. These purported errors are that (1) the ALJ relied too heavily

on the opinion of state agency physicians, (2) the ALJ failed to explain why he rejected portions of two examining physicians' opinions, and (3) the ALJ failed to state what weight he was according to the opinion of a nurse practitioner.

First, to the extent that Plaintiff faults the ALJ for according great weight to opinions of the state agency physicians, I reject this argument. The ALJ was free to do so, as long as the evidence supports the opinions. 20 C.F.R. § 404.1527(c)(3)); *Jarrett*, 422 F. App'x at 873 (11th Cir. 2011).

The ALJ gave great weight to the opinions of Damarys Sanchez, Psy. D. and Pamela D. Green Ph.D, both state agency physicians. (Tr. 386). Dr. Green found that Plaintiff can understand, remember, and carry out simple instructions, make simple work-related decisions, and perform routine tasks. (Tr. 386, 1218). Dr. Sanchez likewise found she can understand, remember, and carry out simple instructions; can work without being overly distracted by coworkers and without requiring special supervision; and has moderate limitations in concentration over extended periods. (Tr. 386, 1266). According to the ALJ, these opinions are consistent with examination notes, treatment notes, Plaintiff's own testimony, and her reported activities of daily living. (Tr. 386).

As to examination notes, Dr. Akagbosu found that Plaintiff had an appropriate mood; normal cognition; and was oriented to time, place, and person. (Tr. 1196). Treatment notes spanning 2006 to 2015 show findings that surely show Plaintiff suffers from mental impairments but those notes are, nevertheless, consistent with Dr. Sanchez and Dr. Green's opinions.

For instance, the ALJ noted that in a 2009 consultation with Dr. Kim Plaintiff's speech was fluent and she "exhibited good insight into current illness, normal affect, and no significant dementia." (Tr. 367, 1411, 1413). She was had normal findings in May and August of 2010: "no memory loss or confusion, no depression, no anxiety, no tension/stress, no sleep disturbances."

(Tr. 369, 1305, 1307). Despite being fidgety, in February 2010, she was still alert and oriented and could make her needs well known. (Tr. 370, 1388). In November 2011, she reported a constantly racing mind, anxiety, depression, and frustration. (Tr. 375, 1550). In April 2013 she reported racing thoughts, and was depressed and anxious but was still oriented and had good rapport. (Tr. 376, 1525). In July 2015 she was anxious and nervous with constant rocking, rubbing hands; but was nonetheless pleasant, affable, and stable, along with being oriented to person, place, time and situation. (Tr. 380, 1694). On that same day, upon a different examination she again displayed nervousness, crying, and rocking; but was still oriented and had congruent affect with fair insight and judgment. (Tr. 381, 1699–1700).

And as to daily activities, Plaintiff could, in limited fashion, prepare simple meals, do some laundry, grocery shop, drive when necessary, handle money, and attend social functions. (Tr. 384, 992–95). Thus the ALJ's decision to give great weight to these opinions is supported by substantial evidence.

Second, Plaintiff asserts that though the ALJ gave great weight to the opinion of Daniel J. Henderson, Ph.D. (Tr. 386), who found that Plaintiff has poor concentration, a limited short term memory, and a GAF score of 40 (Tr. 1188), the ALJ erred by finding that Plaintiff only had moderate limitations in concentration.[3] Yet, most notably, the ALJ made this finding (that Plaintiff has moderate limitations in concentration) in his analysis of whether Plaintiff has a listed impairment. (Tr. 357). And Plaintiff does not bring a challenge to the ALJ's listed impairment analysis.

---

[3] Joseph Fishel, M.D., also noted that Plaintiff had poor concentration and attention, easy distractibility, poor short term memory, and GAF score of 40. Plaintiff asserts that the ALJ also erred in considering Dr. Fishel's opinion, but as the doctor's opinion mirrors Dr. Henderson's, I address Dr. Henderson's opinion as if it belonged to Dr. Fishel too.

More importantly, Plaintiff does not explain why the limited RFC—which provides that Plaintiff can understand, remember, and carry out simple instructions; and perform simple routine tasks—fails to account for her poor concentration. Thus an error, if any, would be harmless at best. *Shaw v. Astrue*, 392 F. App'x 684, 687 (11th Cir. 2010) (finding no reversible error where the ALJ did not address some of an examining physician's findings, where those findings were not inconsistent with the RFC findings and the ALJ relied on the physician's opinion); *Scott v. Astrue*, No. 5:10-CV-111-FTM, 2011 WL 1058960, at *7 (M.D. Fla. Mar. 21, 2011) ("[A]ny argument concerning the ALJ's success or failure to specifically assign any weight to [the doctor's] opinion is not well taken because [the doctor] is a[n] one-time examiner and a non-treating physician and his opinion is consistent with the ALJ's decision."). And, lastly, as to any GAF scores noted by Dr. Henderson, these are, as the ALJ noted (Tr. 383), likewise insufficient to require remand, because "GAF scores do not necessarily reflect a person's ability to do work," *Thornton v. Comm'r, Soc. Sec. Admin.*, 597 F. App'x 604, 613 (11th Cir. 2015), and thus such scores are "not dispositive when determining disability," *Williams v. Comm'r, Soc. Sec. Admin.*, 580 F. App'x 732, 734 (11th Cir. 2014).

Third, Plaintiff notes that the ALJ failed to state what weight he accorded to the opinion of Heather MacLeod, Advanced Practice Registered Nurse (APRN). MacLeod stated in a July 2015 progress note that Plaintiff was "nervous, constant[ly] rocking, rubbing hands, pleasant and much more affable and stable but still very anxious.;" that Plaintiff needs SSI; that "[s]he would not be able to work likely due to the continued presentation of extreme anxiety and stuttering and repetitious stereotypic movements;" that she could volunteer if her limitations were accounted for; that "[a]ny criticism of the patient in a work situation would likely send her backward;" and that "[s]he is very affected by past trauma and lack of skills." (Tr. 1694). There is no error here.

Nurse practitioners are not "acceptable medical sources" for establishing an impairment, 20 C.F.R. § 404.1502(a)(7) (unless the claim was filed after March 27, 2017), but are considered "other medical sources" whose testimony may be used to show the severity of an impairment and how it affects ability to work. 20 C.F.R. § 404.1527(f)(1). In other words, MacLeod's opinion is not entitled to controlling weight as to establishing an impairment. *See Szilvasi v. Comm'r, Soc. Sec. Admin.*, 555 F. App'x 898, 901 (11th Cir. 2014) ("As a preliminary matter, because McCartney is a [non-medical source], not a physician, his opinions are not an acceptable medical source to establish the existence of a medical impairment."). And there is no dispute that the ALJ summarized the above findings (and others made by MacLeod) in his decision. (Tr. 380).

More importantly, Plaintiff does not explain how the findings above constitute limitations that are either disabling or are not accounted for by the RFC. It is hard to say that the ability to volunteer, being affected by past trauma and a lack of skill sets, and an inability to take criticism well are limitations that would preclude work. What is more, as explained below in III.B.3, the ALJ correctly discounted the severity of Plaintiff's stuttering and repetitious movements.

Indeed, Plaintiff merely states the conclusion that the ALJ failed to reconcile MacLeod's opinion with the RFC. Yet the RFC provides for several non-exertional limitations: Plaintiff can understand, remember, and carry out simple instructions; perform simple routine tasks; and, have occasional interaction with supervisors, coworkers, and the public, all of which appear to account for MacLeod's findings. Therefore, to the extent the ALJ erred at all by not stating the weight accorded to MacLeod's opinion, given Plaintiff's failure to articulate here how and why the RFC is inconsistent with the nurse's opinion, such error is harmless. *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir.1983); *Sarria v. Comm'r of Soc. Sec.*, 579 F. App'x 722, 724 (11th Cir. 2014)

("Although the administrative law judge did not state what weight she accorded [two doctors'] opinions, that error was harmless because those opinions were consistent with the findings about [the plaintiff's] mental residual functional capacity."). Lastly, it is well settled that whether a plaintiff retains the ability to work is a matter reserved for the Commissioner. *See* 20 C.F.R §§ 404.1527(d)(1)–(3), 416.927(d)(1)–(3); *Tillman*, 559 F. App'x at 976; *Flowers v. Comm'r of Soc. Sec.*, 441 F. App'x 735, 742 n.5 (11th Cir. 2011) (noting that the conclusions the plaintiff "was totally disabled and unable to work were[] not medical opinions entitled to any special significance").

**B.      The ALJ properly considered Plaintiff's physical impairments**

Plaintiff asserts that the ALJ improperly considered several of her physical impairments: her peripheral vascular disease and polyneuropathy, her shoulder tear, and her stuttering and related symptoms.

1.      First, she complains that the ALJ failed to properly analyze her peripheral vascular disease and polyneuropathy. Yet the ALJ noted these impairments in several portions of the decision at issue.

The ALJ noted a 2006 nerve conduction study that showed "[n]o definite evidence of large fiber polyneuropathy." (Tr. 364, 1485). The ALJ noted 2013 records showing "atherosclerosis of the extremities with intermittent claudication; carotid atherosclerosis; venous insufficiency; varicose veins with swelling." (Tr. 379; 1671–77). And the ALJ noted further Dr. Kim's "impression [of] pain in the feet from multiple mixed etiologies including neuropathy and also some type of peripheral vascular disease for which she underwent venous ablation by Dr. N. Reddy," along with "[a]n EMGNC study performed on June 23, 2015, was abnormal demonstrating distal sensory polyneuropathy of axonal type." (Tr. 380; 1679, 1692). Thus the ALJ

did consider and address records spanning from 2006 to 2015 that detail Plaintiff's polyneuropathy and peripheral vascular disease.

Despite this, Plaintiff points to several parts of the record that the ALJ did not mention in his decision. For instance, Plaintiff notes Dr. Reddy's findings that her peripheral vascular disease rating was "C4a," that an ablation performed by Dr. Reddy was unsuccessful, and that the impairment was ongoing and increasingly worsening into June 2015. Plaintiff concludes "that impairments were never meaningfully analyzed by the ALJ even though both Dr. Reddy and Dr. Kim indicated that the leg and feet symptoms were impacting her ability to perform her daily activities." (Pl.'s Br. at 18). I find no error.

The ALJ is under no obligation to address every part of the record. *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his [or her] decision, so long as the ALJ's decision . . . is not a broad rejection which is "not enough to enable [the district court or this Court] to conclude that [the ALJ] considered her medical condition as a whole.") (quoting *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995) (brackets in the original). So, to the extent the ALJ failed to mention the C4a rating and other evidence, this failure does not necessarily constitute an error in and of itself. Further, Plaintiff presents no evidence that Dr. Reedy (or any other physician) found that she suffers work-related limitations from these impairments.

Simply put, Plaintiff does not explain here that how these impairments caused limitations beyond those included in the RFC. *Ellison*, 355 F.3d at 1276 ("[T]he claimant bears the burden of proving that he [or she] is disabled, and, consequently, [the claimant] is responsible for producing evidence in support of his [or her] claim."). The RFC is very limited—only sedentary work; only occasional ramp or stair climbing; only occasional balancing, stooping, kneeling, crouching, and

crawling; and no climbing ladders, ropes, or scaffolds. (Tr. 358). Given the ALJ's longitudinal consideration of these impairments and the absence of an assertion of how these impairments caused disabling limitations or additional limitations that are not accounted for by the RFC, I cannot recommend remand.

2.      Second, Plaintiff asserts that the ALJ erred by finding that her shoulder impairment did not last twelve months. (Tr. 383). That finding was apparently erroneous—the very first mention in the record of left shoulder pain, at least as it possibly relates to the tear at issue, was in June 2013 (Tr. 1792), and the last mention was by Dr. Kim in June 2015 (Tr. 1679–80).

To explain, in August 2013, Dr. Kim noted that "[s]ince last visit, Plaintiff said that she developed severe pain in the left shoulder region to the point where she could hardly raise her left arm above shoulder level and . . . [s]he still has perceived weakness and burning pain in the left arm in particular." (Tr. 1552). At the time, Plaintiff told Dr. Kim that she "could barely raise her arm above 45 degrees with respect to abduction" and she said that "she cannot do much of anything at this time because of the pain and paralysis of the left arm." (Tr. 1553).

Upon examination, Dr. Kim noted that a "[n]eurological examination performed today was remarkable for severely reduced range of motion of the left shoulder joint in particular, severe tenderness over the left supraspinatus and the proximal deltoid muscles" and that "[t]here is weakness in the left arm (3-4/5)." (Tr. 1552). Dr. Kim then noted that "[t]he weakness of the left arm is . . . due to a suspect rotator cuff tendon tear with the inability to raise the arm above shoulder level." (Tr. 1553). Thus the doctor recommended an MRI. (Tr. 1553).

Two months later, an MRI confirmed that Plaintiff had torn her left shoulder: "MRI examination of left shoulder demonstrating left supraspinatus tendinosis with near full-thickness tear or (focal) full-thickness tear." (Tr. 1607). In December 2013, Dr. Kim performed another

physical examination and again found that a "[n]eurological examination performed today was remarkable for severely reduced range of motion of the left shoulder joint in particular, severe tenderness over the left supraspinatus and the proximal deltoid muscles" and that "[t]here is weakness in the left arm (3-4/5)." (Tr. 1615). The doctor then stated his impression of "[d]iffuse generalized body pain syndrome of mixed etiologies including a rotator cuff tendon tear and tendonitis." (Tr. 1616). On that same day, Dr. Kim then found, in the "*Functional Capacity Evaluation*" form addressed above, that this tear is one of the impairments causing Plaintiff's severe limitations—mostly notably the doctor limited Plaintiff to occasional reaching (including overhead). (Tr. 1613, 1614).

Notably, Dr. Kim, more or less, apparently repeated many of the above-mentioned findings for approximately the next year and a half in progress notes. A progress notes dated October 2014 repeats Plaintiff's self-report that "[s]he could barely raise her arm above 45 degrees with respect to abduction" and that "[s]he said that she cannot do much of anything at this time because of the pain and paralysis of the left arm." (Tr. 1685). About seven months later, Dr. Kim repeated the same self-reports. (Tr. 1682–83). And then finally, again, in June of 2015 those self-reports were repeated—about two years after she first complained about her shoulder and about a year and half after a MRI confirmed her tear. Based on this evidence, and given the ALJ's statement that the shoulder impairment did not last twelve months, Plaintiff concludes that "[t]he ALJ failed to reconcile the medical evidence with the ALJ's residual functional capacity assessment." (Pl.'s Br. at 19).

The Commissioner argues that any error is harmless and I agree. According to the Commissioner, as to any limitations due to Plaintiff's left shoulder rotator cuff tear, Dr. Kim— after learning of the MRI that confirmed the shoulder tear and on the very same day that he

examined Plaintiff and found that, upon, neurological examination she had a severely reduced range of motion of the left shoulder joint in particular, severe tenderness over the left supraspinatus and the proximal deltoid muscles and that there is weakness in her left arm (3-4/5)—clearly opined in the December 2013 "*Functional Capacity Evaluation*" form at issue that Plaintiff can occasionally reach overhead. (Tr. 1613). This limitation is the same imposed by the RFC. (Tr. 358). Thus the Commissioner *correctly* concludes the RFC is consistent with Dr. Kim's opinion.

Though Plaintiff notes here how Dr. Kim noted Plaintiff's statements that she could "*hardly* raise her left arm above shoulder level" and that she "could barely lift her arm above 45 degree with respect to abduction," these are simply Plaintiff's own self-reports—these are not Dr. Kim's opinion about what Plaintiff can and cannot do. Thus the RFC limitation of only occasionally reaching overhead is consistent with Dr. Kim's opinion.

3.      The ALJ found that Plaintiff's "stuttering does not appear to be genuine." (Tr. 382). Plaintiff notes various records where treatment providers note her stuttering and she concludes that "[t]he ALJ erred in rejecting the stuttering as not being genuine," "fail[ed] to explain why these medical providers all made a mistake," and "failed to address the MANY instances where both her physical and mental health providers noted it." (Pl.'s Br. at 20).

I find that the ALJ's consideration of this impairment is supported by substantial evidence. First, the ALJ noted that while Plaintiff stuttered (and presented other behaviors like whimpering, moaning, and rocking back and forth) during the hearing before him, "there are no painful behaviors noted in the medical evidence of record claimant so evidently demonstrated at the hearing." (Tr. 355, 378, 383). Second, the ALJ explicitly acknowledged that Plaintiff has been receiving treatment for her stuttering, that on one occasion where Plaintiff stuttered she had failed to take her insulin, and that on another occasion she was apparently able to control her speech—

"on August 30, 2013, she was noted to be able to immediately stop crying and speak clearly and rationally." (Tr. 354, 374, 1376, 1521). Lastly, and importantly, Plaintiff does not, here, articulate how the RFC, which provides for only occasional interactions with supervisor, coworkers, and the public, fails to account for her stuttering.

Related to Plaintiff's stuttering, the ALJ found that the extent of Plaintiff's rocking back and forth, whimpering, and moaning she displayed at the hearing is not supported by the other evidence: "While it is reasonable for claimant to experience some pain, neither the medical record of evidence, nor claimant's testimony support the extreme pain behavior she demonstrated at the hearing." (Tr. 383). Substantial evidence supports this finding.

For instance, and as summarized above and by the ALJ, despite being fidgety, in February 2010, Plaintiff was still alert and oriented and could make her needs well known. (Tr. 370, 1388). In November 2011, she reported a constantly racing mind, anxiety, depression, and frustration. (Tr. 375, 1550). In April 2013 she reported racing thoughts, and was depressed and anxious but was still oriented and had good rapport. (Tr. 376, 1525). In July 2015 she was anxious and nervous with constant rocking, rubbing hands, *but was nevertheless pleasant, affable, and stable, along with being oriented to person, place, time and situation*. (Tr. 380, 1694). On that same day, upon a different examination she again displayed nervousness, crying, and rocking; *but was still oriented, and had congruent affect with fair insight and judgment*. (Tr. 381, 1699–1700). In sum, the ALJ considered the evidence of Plaintiff's rocking, whimpering and related behavior and such evidence supports the ALJ's decision.

**III.    RECOMMENDATION**

For the reasons stated above, it is respectfully **RECOMMENDED** that the ALJ's decision

should be **AFFIRMED** under sentence four of 42 U.S.C. § 405(g).

**Recommended** in Ocala, Florida on August 31, 2017.

PHILIP R. LAMMENS
United States Magistrate Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties